## In re ROMNEY'S ESTATE.

No. 3736.   Decided April 4, 1922.   Rehearing denied May 24, 1922.
(207 Pac. 139.)

1. TAXATION—STOCK INDORSED TO THE CORPORATION ORGANIZED BY STOCKHOLDER HELD SUBJECT TO INHERITANCE TAX. Where a father organized a corporation, transferred his real estate to the corporation in payment of the stock; divided most of this stock among his children and at the same time indorsed certificates of stock in other corporations to the corporation organized, remained the owner of record of the stock indorsed, received the dividends thereon and thereafter transferred some of the indorsed stock to others without the consent of the corporation organized by him, on the death of the father the indorsed stock was subject to the inheritance tax under Comp. Laws 1917, Sec. 3185 as amended by Laws 1919, c. 64, Sec. 1; the enjoyment and beneficial interest of the indorsed stock having remained in the father during his lifetime.

2. CORPORATIONS—TERM "DIVIDEND" DEFINED. The term "dividend," as applied to corporations in a legal sense and as generally understood in common usage, means earnings or profits which are distributed in proportion to the shares of stock in the corporation owned by the several stockholders.

3. TAXATION—WHERE A FATHER, DAUGHTER'S SOLE HEIR, ASSIGNED INTEREST IN DAUGHTER'S ESTATE, WITHOUT CONSIDERATION, BE-

FORE PROPERTY WAS REDUCED TO POSSESSION, THE PROPERTY WAS
NOT SUBJECT TO INHERITANCE TAX UPON FATHER'S DEATH WITHIN
THREE YEARS. Where a father who was daughter's sole heir,
assigned all his right, title, and interest in and to the daughter's
estate to a son without consideration pursuant to a request
made by the daughter prior to her death, and which property
was never reduced to possession by the father, and title to
which had never been confirmed in him by a decree of court,
and no administrator had been appointed in the daughter's
estate prior to the assignment of property, the property was
not subject to an inheritance tax on the father's death as a
part of his estate; the property at no time having been a part
of the father's estate.

4. TAXATION—STOCK TRANSFERRED TO CORPORATION AND DISTRIBUTED
TO STOCKHOLDERS AS DIVIDENDS NOT SUBJECT TO INHERITANCE TAX
IN ACTION TO WHICH STOCKHOLDERS WERE NOT PARTIES. Where
a father organized a corporation and distributed most of the
stock between his children, and assigned stock of other cor-
porations to the corporation so organized, which was subse-
quently distributed to the children in the form of dividends, the
stock so distributed could not be declared subject to inheritance
tax upon the father's death, where the children were not parties
to the proceeding.

On Application for Rehearing.

5. APPEAL AND ERROR—SUPPLEMENTAL ASSIGNMENT OF ERROR, MADE
UNDER ORDER OF COURT ON SEASONABLE APPLICATION, CONSIDERED.
Where original assignment of error, complaining of the insuffi-
ciency of the evidence, did not comply with Supreme Court
rule No. 26 (54 Utah xv, 196 Pac. ix) because of failure to
specify wherein the evidence was insufficient to support the
findings, a supplemental assignment of error, filed under order
of a justice of the court made on seasonable application, in the
absence of a showing of prejudice to the respondent, will be
considered.[1]

Appeal from District Court, Third District, Salt Lake
Coounty; *G. A. Iverson,* Judge.

In the matter of the estate of George Romney, deceased,
on petition of William D. Sutton, as State Treasurer, for an
order citing the George Romney & Sons Company and Wil-

---

[1] *Baglin* v. *Earl-Eagle Min. Co.,* 54 Utah, 588, 184 Pac. 196.

Appeal from Third District

liam S. Romney, as administrator of the estate of Jane Agnes Romney, deceased, to show cause why an inheritance tax should not be paid by each on certain property alleged to have been transferred to them by the deceased, George Romney. Judgment dismissing petition, and petitioner appeals.

AFFIRMED in part, and REVERSED and REMANDED in part.

*H. H. Cluff*, Atty. Gen., and *L. A. Miner*, Asst. Atty. Gen., for appellant.

*Stewart, Stewart & Alexander* and *L. E. Cluff*, all of Salt Lake City, for respondents.

GIDEON, J.

William D. Sutton, as State Treasurer, filed petition in the probate proceedings in the estate of George Romney, deceased, late of Salt Lake county, praying for an order citing the respondents, George Romney & Sons Company and William S. Romney as the administrator of the estate of Jane Agnes Romney, deceased, to show cause before the court why an inheritance tax should not be paid by each respectively upon certain property alleged to have been transferred to them by the deceased, George Romney. In response to the order of the court respondents filed separate answers. The answers denied the right of the state to have or collect an inheritance tax on any property held by either. On the issues thus joined the court heard evidence, made elaborate findings, and entered judgment dismissing the petition on its merits as to both respondents and awarded costs against the State Treasurer. From that judgment the State Treasurer appeals, and the entire record is before this court for review.

The appellant relies on Comp. Laws Utah 1917, § 3185, as amended by chapter 64, Laws Utah 1919. The section, so

far as material to the question under consideration on this appeal, reads:

"All property within the jurisdiction of this state, and any interest therein, whether belonging to the inhabitants of this state or not, and whether tangible or intangible, which shall pass by will or by the statutes of inheritance of this or any other state, or by deed, grant, bargain, sale or gift, made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after the death of the grantor, vendor or donor, to any person in trust or otherwise, and, for the purposes of this act, any transfer of a material part of any such property in the nature of a final disposition or distribution thereof made by the decedent within three years prior to his death, except in case of a bona fide sale for a fair consideration in money or money's worth, unless shown to the contrary, shall be deemed to have been made in contemplation of death, shall be subject to the following tax, after the payment of all debts, for the use of the state. * * *"

Many errors are assigned. We shall not, however, attempt to consider them in detail.

There is little, if any, dispute as to the material facts. The duty of the court, therefore, is to apply to such facts the rules of law governing the rights of the parties.

It appears that on May 14, 1903, the deceased and 10 of his sons entered into articles of agreement for the incorporation of the George Romney & Sons Company as a corporate entity under the laws of the state of Utah. The authorized capital stock was $200,000, divided into 2,000 shares of the par value of $100 each. George Romney subscribed for 1,990 of the 2,000 shares. One share each was taken by the other incorporators. Upon the organization of the company, George Romney transferred 1,982 of the 1,990 shares owned by him to his sons and daughters, 24 in number, giving 82 shares to each son and 83 shares to each daughter. The entire capital stock was fully paid by George Romney conveying to the corporation certain real property described in detail in the articles. The corporation received the real estate in full payment of its authorized capital stock, and no question is raised anywhere in the record that the real estate so conveyed was not of the full value of the stock issued.

It is without dispute that the real estate prior to such con-

veyance to the corporation was exclusively the property of George Romney, and it seems to be conceded that the conveyance was made contemporaneously with the execution of the articles of incorporation.

On May 20, 1903, George Romney executed a paper denominated "Transfer," in which, for the consideration of $1 "and for good and valuable consideration," it is recited that he sold, conveyed, and delivered to the George Romney & Sons Company a long list of enumerated corporate stock representing his holdings in various other corporations. It is alleged in the petition that the value of this stock was $500,000. In the transfer it is also recited that the certificates had been "indorsed and delivered" to the George Romney & Sons Company. On May 9, 1908, George Romney executed two additional papers, purporting to "sell and assign" to the George Romney & Sons Company certain bonds and other corporate stock. The consideration mentioned in each of these papers was $1 and other good and valuable consideration. At the dates of the transfers, in 1903 and in 1908, none of this corporate stock was surrendered to the corporations issuing the same; nor were any certificates issued to the George Romney & Sons Company evidencing ownership thereof during the life of George Romney. No new certificates were issued by any of the corporations during his lifetime, except for the purpose of having other certificates issued to George Romney or to certain of his heirs in the year 1918. With the exception of a few shares of stock in the Z. C. M. I. and in the George Romney Lumber Company, the record shows no exception to that method of treating these various stocks. It is in the record that these stocks, after indorsement, were placed in a safety box in a savings bank rented in the name of the respondent company, to which George Romney, as president, had a key during his lifetime. There is some testimony that one of his sons, as vice president, during a part of the time, also had a key which gave him access to this box. The stock represented by these various certificates upon the books of the corporations issuing the same stood in the name of George Romney until the date

of his death, with the exception of the stock in the Amalgamated Sugar Company, Utah-Idaho Sugar Company, Deseret National Bank, Home Fire Insurance Company, and possibly one or two others. Reference will be made to the disposition of these stocks later in this opinion.

The dividends upon these various certificates of stock from the claimed transfer were all paid to George Romney personally. There is nowhere in the record any proof, competent or otherwise, showing that $1 of these various amounts paid in dividends ever found lodgment in the treasury of the respondent corporation. On the contrary, the affirmative proof of the officers of the different corporations issuing these various certificates of stock is that all dividends had been paid to the record holder of the stock, namely, George Romney. Canceled checks representing $5,000 in dividends paid by the Amalgamated Sugar Company on the stock in that company from January, 1912, to December, 1917, are in the record. They are all made payable to George Romney. No effort was made to show that $1 of that amount was ever credited to the account of the respondent company.

As illustrative of the control over this corporate stock retained by George Romney we shall consider the stock owned by him in two of the corporations, namely, the Z. C. M. I. of Salt Lake City and the Amalgamated Sugar Company of Ogden.

The Z. C. M. I. stock owned by George Romney was included in the list transferred May 20, 1903. Other and additional stock in the same concern was sold and assigned by the paper executed in May, 1908. All of these certificates so transferred and sold were indorsed to George Romney & Sons Company. Notwithstanding such sale and transfer and indorsement, it appears that as late as November 8, 1917, these certificates of stock were surrendered, and new certificates issued therefor in the name of George Romney. On November 10, 1917, these new certificates were indorsed to George Romney & Sons Company, but at a later date the indorsee's name was "scratched out" and the stock reissued in various amounts to the children of George Romney. No record is

found that the respondent corporation ever consented to the surrender of this stock, or ever consented to its indorsement to any one else—in fact, there is no record that the corporation ever exercised any control over it. This stock, with other corporate stock aggregating many thousands of dollars in value, and which it is claimed was given to the respondent corporation by the papers executed in 1903 and 1908, was re-indorsed, and other indorsees' names inserted in the indorsement, and the stock surrendered and passed to others, without any action on the part of the corporation so far as its records show.

In the case of the stock in the Amalgamated Sugar Company, the original certificate, known as No. 22, for 67 shares, was indorsed by George Romney to the respondent corporation May 20, 1903. It remained, however, in the name of George Romney upon the books of the sugar company until December, 1914. It was then surrendered, and a new certificate issued to George Romney for 100 shares. In November, 1917, this certificate was surrendered, and in lieu thereof four other certificates for 250 shares each were issued to George Romney. These certificates represented other stock which the holder of the original certificate was entitled to upon a stock dividend declared. These new certificates were indorsed by George Romney in blank. On February 7, 1918, the certificates were surrendered, and in lieu of them shares of stock to 15 different persons were issued in various amounts, representing the 1,000 shares of stock received by George Romney in November, 1917.

The final distribution of the stock in the Utah-Idaho Sugar Company, in the Deseret National Bank and in the Home Fire Insurance Company was similar to the disposition of the Z. C. M. I. and the Amalgamated Sugar Company stock.

Other stock mentioned in the transfers of 1903 and 1908 remained in the name of George Romney on the books of the corporations issuing same until after his death. At that date the stock indorsed by him was surrendered, and other stock issued therefor in the name of the respondent corporation.

It would serve no good purpose to further review the history of the control over this stock or the certificates of

stock representing the interests in the various corporations by George Romney during his lifetime. It is enough for the purpose of the question presented by this appeal to state that no other conclusion is logical or reasonably inferrable from the history of the entire transaction than that the enjoyment and beneficial interest of the stock that finally found resting place in the name of the respondent corporation did not vest in such corporation during the life of the donor.

The law here applicable is concisely stated in the third headnote to *Reish, Adm'r,* v. *Commonwealth,* 106 Pa. 521, which clearly reflects the decision in that case and which reads as follows:

"The owner of an estate cannot defeat the plain provisions of the Collateral Inheritance Law (Act of April 7, 1826) by any device which secures to him, for life, the income, profits and enjoyment of his estate. Said law can only be defeated by such a conveyance as parts with the possession, the title and the enjoyment during the grantor's lifetime."

See, also, *Dubois' Appeal,* 121 Pa. 368, 15 Atl. 641.

It stands as an admitted fact, and that should be borne in mind at all times in the consideration of the ownership of this stock, that all of the stock was originally the individual property of George Romney. If the naked legal title to that stock or the enjoyment of the beneficial interest, or both, ever vested in the respondent corporation, such vested interest is based wholly upon the voluntary relinquishment and transfer by the act of the donor.

We need not determine in this proceeding whether the facts warrant the conclusion that there ever had been a completed gift even of the naked title. There is no dispute in the law as to what acts are requisite to constitute a completed gift. 12 R. C. L. 932; *Maxler* v. *Hawk,* 233 Pa. 316, 82 Atl. 251, Ann. Cas. 1913B, 559. The difficulty arises in applying such rules to the multitudinous and complicated transactions of men. *Cook* v. *Lum,* 55 N. J. Law, 373, 26 Atl. 803. In the district court the Attorney General tried this case upon the theory that the beneficial interest and enjoyment had not vested in the donee until the death of the donor, and the case has been argued upon that theory here.

We are clearly of the opinion that the undisputed facts sustain that theory, and that no other conclusion is permissible than that such interest and enjoyment did not vest in the respondent corporation until the death of George Romney.

No ledger or other account was ever kept by the corporation showing its receipts and disbursements. No record was produced of any minutes of the meeting of the directors or of the stockholders during the 17 years between the date of the incorporation of the company and the death of its president and manager. The district court and this court are without a scintilla of evidence to support the contention of the respondent corporation that it exercised control and received the benefits and enjoyment of the dividends paid from time to time upon the corporate stock hereinbefore referred to, and which it is now claimed should be exempt from taxation by reason of the gifts made in the years 1903 and 1908, except the mere fact of the indorsement of such stock by George Romney. If there were any evidence in the record supplementing or in addition to the written indorsements and the placing of the certificates of stock in the safety deposit box, there might be some foundation upon which to base such contention. On the contrary, there is positive proof that the dividends were paid to the original holder of the stock, namely, George Romney. As stated elsewhere in this opinion, there are in the record canceled checks aggregating the sum of $5,000, which, by their indorsements, show that George Romney received such dividends personally. No evidence is found nor any facts stated from which a reasonable inference can be drawn that any such dividends ever passed to the credit of the treasurer of this respondent corporation. There was testimony introduced with a view of showing that the stockholders had received dividends at various times, and from that it is argued that this respondent must have received the dividends from this corporate stock. The total amount of the dividends paid by the respondent to its stockholders, according to the highest estimate of any witness, does not exceed $75,000. It should be remembered that $200,000 in value of real estate was turned into the corporation at the

date of its organization. The record is replete both in the testimony and in the briefs of counsel, that the George Romney & Sons Company was a prosperous corporation; that George Romney was an able, astute business man, retaining his faculties to a remarkable age, and that he was for many years one of the leading business men of this community. Dividends in the sum of $75,000 from a capitalization of $200,000 under such management and during the prosperous years from 1903 to 1920 ought not be considered very strong or conclusive evidence that the respondent corporation was receiving and applying to the benefit of the stockholders an income from property in addition to its real property. It is also in the record that none of the officers, save the president, George Romney, received any salary for their services in connection with such corporation. There is no testimony showing what salary deceased did receive, but he was permitted to take such salary for his services as he felt that he was entitled to receive. In other words, the stockholders had absolute confidence in his integrity, and felt assured that he would never take anything from the treasury of the corporation to which he was not entitled.

Much is said in the arguments to the effect that the stockholders of the corporation, soon after its organization, by resolution, gave to its president practically unlimited authority in the control and management of the corporate affairs. It is argued on the part of the Attorney General that such fact is evidence that the control and ownership of this property, both real and personal, remained with the deceased, and the use and enjoyment of the same did not pass to his heirs until after his death. The deceased was a man of recognized business ability. He had given to this corporation all the property it possessed. Its stockholders were his children and heirs. In view of these matters it was only natural that the stockholders should repose absolute confidence in his management of the affairs of the corporation, and under these circumstances the control of the corporation by the deceased can be given no serious consideration in the determination of the questions presented by this record.

It is claimed that there is testimony tending to show ownership and control of these various stocks by the respondent corporation based upon an alleged dividend paid by the corporation to its stockholders in the early part of 1918. At that time much of the corporate stock and the stock received as dividends upon the original certificates of stock named in the transfers of 1903 and 1908 was distributed to the stockholders of the respondent corporation. These individual stockholders were children of the deceased. As stated before, no record of the action taken by the directors in declaring this dividend is found. One witness placed the time of the meeting of the directors as December, 1917, and another witness thought it was in January, 1918. The amount of the so-called dividend was not based upon or determined by the earnings of the corporation. The corporation had from time to time loaned or advanced to the different stockholders various sums of money and taken notes from such stockholders for such amounts. The largest amount loaned to any one stockholder was $13,000. In order to liquidate this indebtedness it is claimed that the largest amount owing by any one stockholder was selected as the basis upon which to declare a dividend. That amount was multiplied by the number of stockholders and a dividend aggregating the multiple was agreed upon. Stock of these various corporations representing the difference in value between the amounts owing by each individual stockholder and the amount of the dividend was transferred and caused to be issued to such stockholder. That is, the stockholder owing $13,000 would receive no stock and the one owing $5,000 would receive stock representing the difference in value between $13,000 and $5,000. The deceased was at that meeting. He was then 86 years of age, but in good health and of sound mind. Other directors were present. The deceased's son-in-law, an experienced attorney at law, was also present, called there by the deceased. It is passing strange that, if it was then recognized and accepted by the deceased and others interested in this corporation that not only the legal title but the use and enjoyment of these various corporate stocks had theretofore vested in the re-

spondent corporation, no record of the action of the directors in thus distributing the assets of the corporation, aggregating in value more than $100,000 was thought necessary. The amount of the dividend was not determined by the earnings of the corporation. No claim or contention is made that such is the fact. The earnings of the corporation were in no way considered in arriving at the amount of the dividend. The term "dividend," as applied to corporations, in a      2 legal sense and as generally understood in common usage, means earnings or profits. 6 Fletcher Cyc. Corps., § 3649. Such earnings or profits are distributed in proportion to the shares of stock in the corporation owned by the several stockholders. The deceased, as appears from the inventory filed in the estate, was a stockholder, and yet it nowhere appears in the distribution of this dividend that he received his pro rata share, or that such was given or allowed him. The conclusion seems irresistible that no one considered or treated the distribution of this stock to the various children of the deceased as a dividend paid by the corporation, but, rather, as effectuating a desire on the part of the deceased to relieve his children from the indebtedness owing by some of them to the corporation and at the same time distribute his estate equally among his various children entitled to share in the distribution of the same. The will of the deceased, made in the year 1917, and the codicils thereto, emphasize the fact that it was the desire of George Romney that his children should share equally in his estate and in all property emanating therefrom.

In our judgment there is no evidence in the record to support the claim that at the time George Romney organized the respondent corporation in 1903 and conveyed to it certain real property and afterwards gave to his several children practically all of the capital stock of that company he did so in contemplation of death. On the contrary, the evidence is undisputed that at that time Mr. Romney was in good health and actively engaged in business. He continued to look after the business of the company for many years. The title to the real property so conveyed remained continuously .

in the name of the corporation, and the control and management of the same was under its direction. In our judgment there is in the record competent substantial testimony to support the finding of the trial court that the real property passed from the control of the deceased.

Respecting the right of the state against the administrator of the estate of Jane Agnes Romney, deceased: Miss Romney died in May, 1918. Her father, George Romney, as the surviving parent, was the sole heir to her estate. In November, 1918, George Romney, by deed of transfer, assigned all of his right, title, and interest in and to the property of the estate of his daughter to William S. Romney, a son of George Romney. Admittedly the transfer of George Romney's interest in his daughter's estate to William S. Romney was within three years prior to the death of George Romney, and was without consideration except carrying into execution a verbal trust or request of his daughter. It appears that the daughter had requested her father that if he survived her he should as her sole heir, give or transfer her property to her brother William S. Romney. This brother, it seems, knew what disposition she wished made of her property. In carrying into effect that request the transfer or assignment was made. No case has been called to the court's attention in which the facts are analogous to the facts here recited. No principle or rule of law is suggested why the property of the daughter's estate should be subject to a tax as a part and parcel of the property of the estate of George Romney, deceased. The property was never a part of his estate. He never reduced it to his possession by having a decree of court confirming his title. He at no time exercised ownership or control over this property. William S. Romney was not appointed administrator until after his father's death. George Romney, by virtue of the statutes of this state, was entitled to receive this property as sole heir, but before reducing it to possession, in November, 1918, he divested himself, and thereby his estate, of any claim or interest in the property of his daughter's estate. In our judgment the court was clearly right in refusing to treat this property as a part of the prop-

erty of the estate of George Romney, deceased, liable to an inheritance tax.

No order is or can be made respecting the right of the state to collect a tax on the corporate stock given or distributed to the various children of the deceased, George Romney, by the claimed dividend distribution made in the early part of 1918. The parties to whom that stock was transferred are not parties to this action. As indicated herein, we are clearly of the opinion that the right to the use and enjoyment of this corporate stock never at any time vested in the corporation. That right to the use and enjoyment of it at all times remained in the deceased until he was divested of it by the transfers made in 1918. If it be claimed that the naked title, by the transfers and conveyances made in 1903 and 1908, vested in the respondent corporation, it can reasonably be held that the corporation, by its acts as testified to by some of its officers, consented that the legal title should follow the use and enjoyment at the time the transfers were made and the stock reissued in the early months of 1918.

The judgment of the district court denying to the appellant any right to an inheritance tax against the real property conveyed to the respondent corporation, and denying judgment to the appellant against the administrator of the Jane Agnes Romney estate, is affirmed; the court's judgment refusing to enter judgment against the respondent corporation for a tax based upon the value of the stock which passed into the name of that corporation, and which was included in any of the transfers made in 1903 and 1908 is reversed and set aside. The cause is remanded to the district court of Salt Lake county, with directions to modify its judgment in compliance with the views herein expressed, and to cause an appraisement to be made of the corporate stock as of the date of the death of George Romney and to enter judgment against the respondent corporation for such amount in conformity with the statute authorizing an inheritance tax. The costs of the appellant are allowed against the respondent cor-

poration, and the costs of the respondent William S. Romney, administrator, are allowed against the appellant.

CORFMAN, C. J., and WEBER, THURMAN, and FRICK, JJ., concur.

## On Application for Rehearing.

GIDEON, J.  George Romney & Sons Company, respondent, and the State Treasurer, appellant, have each petitioned for a rehearing.

The respondent complains that the court was without authority or right to consider the assignment of errors relating to the insufficiency of the evidence to support the findings of the lower court.  It is argued that the original assignment failed to comply with rule 26 of this court 54 Utah xv, (196 Pac. ix), in that such assignment did not specify or point out wherein the evidence is insufficient to support the findings.

The case was argued and submitted on February 24, 1922. On the 15th of .that month the appellant applied to a member of this court, and was given authority to file a supplemental assignment of errors.  That order has never been revoked.  The assignment of errors then filed, of necessity, is a part of the record on this appeal.  It is not contended that the court is without authority to make such an order.

This court, in *Baglin* v. *Earl-Eagle Min. Co.*, 54 Utah, 588, 184 Pac. 196, in discussing a question similar to the one now urged by counsel, says:

"Even admitting that in certain cases the appellant may be permitted to file an assignment of errors after the time expires, or to amend an assignment already filed, upon seasonable application, where no prejudice inures to the opposing party, still, in our opinion, it would be an unwarranted extension of the privilege to permit an appellant to amend its assignment under circumstances such as exist in the present case.  Here the appellant failed to assign as error the matter in controversy at the time he filed his assignment of errors.  The respondent's brief called attention to the fact that there was no assignment of error as to that question,

the case was argued and submitted, an opinion was rendered reversing the case partly on the ground that the evidence as to damage was insufficient, respondent applied for a rehearing, and again makes the point that there was no assignment of error as to one of the points upon which the case was decided. Then, for the first time, appellant asks for leave to amend."

In the instant case the application was seasonably made, and it is not shown that respondent was in any way prejudiced. In the very nature of things prejudice to the respondent could not result, as it simply brought the matter before this court with such a record that the court could examine the whole case and determine it upon merits. This contention, therefore, cannot prevail.

We are satisfied with the conclusions reached on the merits of the case as the same affect respondent George Romney & Sons Company. In fact, a further consideration of the record convinces this court that the respondent received every consideration to which the facts entitled it both in the district court and in this court.

The burden of the petition of the State Treasurer seems to be that the court, in determining that the estate of George Romney, deceased, was not liable for an inheritance tax upon the property of the estate of Jane Agnes Romney, deceased, has gone outside of the issues made by the pleadings. It is now insisted that it was not sought to subject the estate of George Romney, deceased, to an inheritance tax upon the property of the Jane Agnes Romney estate. If that be true then William S. Romney, as administrator of the estate of Jane Agnes Romney, is not a proper party to this proceeding. It was not the intention of this court, nor do we think a fair reading and interpretation of the opinion warrants any such conclusion that the court did intend to determine that William S. Romney was not liable to pay an inheritance tax to the state upon the property of the Jane Agnes Romney estate. The writer at least assumed that it was understood that William S. Romney, as administrator, had paid or would pay the inheritance tax on the property of the estate being administered by him. If he decline to do so, necessarily the proper proceeding is to apply to the court in that estate, and

not in the matter of the George Romney estate. The facts disclose that George Romney, as the sole heir of his deceased daughter, elected to carry into effect an oral trust of the property to the beneficiary. The court was of the opinion and held that his estate was not liable for the inheritance tax. Nothing else was passed upon, nor intended to be passed upon, by the decision of the court in that regard.

The petitions for rehearing are denied.

CORFMAN, C. J., and WEBER, THURMAN, and FRICK, JJ., concur.